IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

KRISTEN DAY, et al.,

             Plaintiffs,

     vs.                       **Case No. 04-4085-RDR**

KATHLEEN SEBELIUS,
personally and in her
official capacity as
Governor of Kansas, et al.,

             Defendants.

---

<u>**MEMORANDUM AND ORDER**</u>

This is an action brought by the plaintiffs challenging K.S.A. 76-731a(formerly known as House Bill 2145), which became law on July 1, 2004.  Plaintiffs contend that K.S.A. 76-731a unlawfully and unfairly allows undocumented or illegal aliens to attend Kansas universities and pay resident or in-state tuition.[1]  Plaintiffs are either students at Kansas regents schools or parents of those students.  The students are United States citizens who have been classified as non-residents of Kansas for

---

[1] The statute in general provides that any individual who attended an accredited Kansas high school for three years and either graduated or earned a Kansas general education development certificate, and meets the law's other criteria, is eligible to pay tuition rates equivalent to Kansas resident rates at regents schools.  Although plaintiffs contend that the statute applies only to undocumented or illegal aliens, the statute appears to apply to all, with a few minor exceptions, who meet the designated criteria "regardless of whether the person is or is not a citizen of the United States of America." K.S.A. 76-731a(b)(2).

tuition purposes at their respective schools.  The defendants are the Governor of Kansas, the members of the Board of Regents, and the registrars of the University of Kansas, Kansas State University and Emporia State University.  Two groups, Kansas League of United Latin American Citizens (KLULAC) and Hispanic American Leadership Organization, Kansas State Chapter (HALO), have been allowed to intervene as defendants in this action.

In their complaint, plaintiffs object to the ability of undocumented or illegal aliens[2] to avail themselves of K.S.A. 76-731a.  Plaintiffs seek injunctive relief and declaratory relief.  They seek injunctive relief enjoining the defendants from enforcing K.S.A. 76-731a as it applies to "aliens who are unlawfully present in the United States."  They also ask the court to enjoin the defendants from discriminating between students who have been classified as legal residents of Kansas and them.  Finally, they ask the court to declare that K.S.A. 76-731a violates federal law and is unconstitutional as it applies to "aliens who are unlawfully present in the United States."

On May 10, 2005 the court held a hearing in this matter.

---

[2]All parties have referred to individuals who are not United States citizens who have entered this country unlawfully without documentation as "undocumented" or "illegal" aliens.  The court intends to use these terms interchangeably during the course of this opinion.

The following motions were considered at that time: (1) defendants' motion to dismiss; (2) intervenors' motion to dismiss; and (3) plaintiffs' motion to dismiss intervenor-defendants. Prior to that hearing, the court had conducted several telephone conferences with the parties. The parties were advised that all evidence on the issues in this case should be presented prior to the May 10th hearing or at that hearing. All parties were in agreement that the hearing on May 10th would constitute the final hearing in this matter. The court subsequently received materials outside the pleadings from all parties. Under these circumstances, the court shall convert the pending motions to dismiss to motions for summary judgment. See Burnham v. Humphrey Hospitality Reit Trust, Inc., 403 F.3d 709, 713 (10th Cir. 2005); Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004). Having considered all of the evidence presented and heard extensive argument from the parties, the court is now prepared to rule.

This litigation arises from the passage of two laws by Congress in 1996 restricting immigration and the status of immigrants: the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). These laws were passed by the same Congress only about six weeks

apart.  They were passed in part in response to the Supreme Court's decisions in <u>Plyler v. Doe</u>, 457 U.S. 202 (1982) (Texas statute which denies free education to alien children violates Equal Protection Clause) and <u>Toll v. Moreno</u>, 458 U.S. 1 (1982) (University of Maryland's policy of denying treaty organization aliens the opportunity to pay reduced, in-state tuition constituted a violation of the Supremacy Clause).

The Kansas legislature passed the instant statute in 2004. The court is aware of least seven other states that have passed legislation to provide in-state tuition rates to illegal aliens: California, Illinois, New York, Oklahoma, Texas, Utah and Washington.  The legislature of Maryland passed legislation to allow in-state tuition to illegal aliens, but the legislation was vetoed by the governor.  At least two states have specifically passed statutes that do not allow illegal aliens to gain resident tuition status:  Alaska and Mississippi.  The legislature of Virginia passed legislation prohibiting illegal aliens from receiving resident tuition, but the legislation was vetoed by the governor.  The court believes this is the first case to challenge the type of legislation passed by Kansas.

Plaintiffs' complaint consists of seven claims for relief. The court shall spend some time analyzing the claims made by the plaintiffs due to arguments that have been made about the

confusing nature of the claims.

In Count 1, which is entitled "Violation of 8 U.S.C. § 1621," plaintiffs contend that K.S.A. 76-731a violates 8 U.S.C. § 1 6 2 1 . [3]

---

[3] This statute provides as follows:
(a) In general
Notwithstanding any other provision of law and except as provided in subsections (b) and (d) of this section, an alien who is not--
(1) a qualified alien (as defined in section 1641 of this title),
(2) a nonimmigrant under the Immigration and Nationality Act [8 U.S.C.A. § 1101 et seq.], or
(3) an alien who is paroled into the United States under section 212(d)(5) of such Act [8 U.S.C.A. § 1182(d)(5)] for less than one year,
is not eligible for any State or local public benefit (as defined in subsection (c) of this section).
(b) Exceptions
Subsection (a) of this section shall not apply with respect to the following State or local public benefits:
(1) Assistance for health care items and services that are necessary for the treatment of an emergency medical condition (as defined in section 1396b(v)(3) of Title 42) of the alien involved and are not related to an organ transplant procedure.
(2) Short-term, non-cash, in-kind emergency disaster relief.
(3) Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease.
(4) Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (A) deliver in-kind services at the community level, including through public or private nonprofit agencies; (B) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (C) are necessary for the protection of life or safety.
(c) "State or local public benefit" defined

According to plaintiffs, § 1621 prohibits any state from offering any post-secondary educational benefit, including in-state tuition, to illegal aliens.  Plaintiffs further allege that K.S.A. 76-731a does not meet the statutory loophole set

---

(1) Except as provided in paragraphs (2) and (3), for purposes of this subchapter the term "State or local public benefit" means--
(A) any grant, contract, loan, professional license, or commercial license provided by an agency of a State or local government or by appropriated funds of a State or local government; and
(B)
(2) Such term shall not apply--
(A) to any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States, or to a citizen of a freely associated state, if section 141 of the applicable compact of free association approved in Public Law 99-239 or 99-658 (or a successor provision) is in effect;
(B) with respect to benefits for an alien who as a work authorized nonimmigrant or as an alien lawfully admitted for permanent residence under the Immigration and Nationality Act [8 U.S.C.A. § 1101 et seq.] qualified for such benefits and for whom the United States under reciprocal treaty agreements is required to pay benefits, as determined by the Secretary of State, after consultation with the Attorney General; or
(C) to the issuance of a professional license to, or the renewal of a professional license by, a foreign national not physically present in the United States.
(3) Such term does not include any Federal public benefit under section 1611(c) of this title.
(d) State authority to provide for eligibility of illegal aliens for State and local public benefits
A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) of this section only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility.

6

forth in 8 U.S.C. § 1621(d), which allows states under certain circumstances to provide eligibility for illegal aliens to state benefits, because it does not contain the express statutory language required by federal law.

In Count 2, which is entitled "Violation of 8 U.S.C. § 1623," plaintiffs assert that K.S.A. 76-731a violates 8 U.S.C. § 1623(a).[4] According to plaintiffs, § 1623 prohibits any state from providing any postsecondary education benefit, including in-state tuition, to an illegal alien unless a United States citizen is eligible for the same benefit.  Plaintiffs further assert that § 1623 eliminated the application of 8 U.S.C. § 1621(d).

In Count 3, which is entitled "Violation of Regulations Governing Alien Students," plaintiffs contend that K.S.A. 76-731a violates the comprehensive regulatory scheme enacted by the federal government to govern the admission of nonimmigrant aliens to the United States for the purpose of enrolling them as

---

[4] This portion of the statute provides as follows:
(a) In general
Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

students at postsecondary educational institutions. They specifically point to the Student and Exchange Visitor Information System (SEVIS), a comprehensive computerized system designed to track international students and exchange students. Plaintiffs contend that K.S.A. 76-731a frustrates this federal purpose by allowing aliens to illegally pose as students at Kansas institutions of higher education while remaining outside the SEVIS registration system.

In Count 4, which is entitled "Preemption," plaintiffs claim that K.S.A. 76-731a is preempted by the federal regulation of immigration.  Plaintiffs suggest that Congress clearly intended to "occupy the field" in the area of regulating the provision of public benefits to aliens without a lawful immigration status. They assert:  "The power to regulate immigration is unquestionably an exclusively federal power, and any state statute that regulates immigration is unconstitutional and therefore proscribed. . . . States can neither add to nor take from conditions lawfully imposed upon the admission or residence of aliens in the United States. . . . [K.S.A. 76-731a] is preempted because it is impossible for a person who is an illegal alien or otherwise present in the United States to both receive postsecondary education under [K.S.A. 76-731a], and to comply with federal immigration law."

8

In Count 5, which is entitled "Creation of Residence Status Contrary to Federal Law," plaintiffs allege that K.S.A. 76-731a creates residence status for illegal aliens contrary to federal law. Plaintiffs assert: "Congress has created a legal disability under federal law that renders illegal aliens incapable of claiming bona fide legal domicile in Kansas, notwithstanding the fact of physical presence or a subjective 'intent' to remain indefinitely in the jurisdiction." They further allege: "None of the members of the class of alien beneficiaries of [K.S.A. 76-731a] who are illegal aliens possesses federal authorization to remain in the United States for even the shortest period of time, and therefore cannot, as a matter of law acquire or possess the requisite intent to be a legal resident or domiciliary of Kansas. Kansas may not deem such non-citizens to possess such intent, nor alternatively waive such intent by exercise of its legislative powers." By doing so, plaintiffs argue that K.S.A. 76-731a violates the comprehensive scheme established by federal law for aliens.

In Count 6, which is entitled "Infringement Upon Exclusive Federal Powers," plaintiffs assert that K.S.A. 76-731a impermissibly infringes on Constitutional powers reserved to the federal government. They contend that the challenged Kansas law violates Congress' power over the regulation of interstate

commerce and foreign affairs.

Finally, in Count 7, which is entitled "Violation of Equal Protection Clause of U.S. Constitution," plaintiffs contend that K.S.A. 76-731a violates the Equal Protection Clause of the United States Constitution.   Plaintiffs assert that equal protection is denied them based upon the following argument: "Illegal aliens have been deemed by Defendants to be Kansas residents for the express purpose of affording such aliens state postsecondary education benefits to which they are not entitled under federal law.   Defendants have further denied nonresident U.S. citizens Plaintiffs the identical postsecondary education benefits to which they are expressly entitled by federal law." They further state:

> Discriminating against U.S. citizens in favor of illegal aliens in the provision of postsecondary education benefits does not serve any important government objective.   Awarding valuable benefits to individuals whose presence in the United States constitutes an ongoing violation of federal law plainly undermines the general governmental objective of promoting rule of law.   Moreover, any purported government interest in encouraging higher education in the State's workforce is unpersuasive, because the illegal alien recipients of such postsecondary education benefits are not legally eligible to remain in the State of Kansas after completing their courses of study.

The court has provided a thorough explanation of the claims in order to respond to some of the arguments that have been made by the parties.   The court will discuss these contentions as we

10

address the pending motions.

**PLAINTIFFS' MOTION TO DISMISS INTERVENOR-DEFENDANTS**

Plaintiffs seek to dismiss the three anonymous illegal alien intervenors and the two organizational intervenor-defendants.[5] Plaintiffs suggest the three individual intervenors should be dismissed because they failed to disclose their real names as required by Judge O'Hara's order of February 24, 2005.  The court finds this issue moot.  The intervenors have not included these individuals in their amended answer.  Since they are no longer a part of this case, this aspect of the plaintiffs' motion is moot.

Plaintiffs also suggest that the association intervenors KLULAC and HALO should be dismissed because they lack associational standing.  They initially argued that these organizations had not disclosed sufficient information to ascertain their standing to intervene.  In response to that argument, KLULAC and HALO agreed to provide <u>in</u> <u>camera</u> information to the court for consideration of their standing.

_____

[5] Procedurally, the court is puzzled by this motion.  Many of the issues raised by plaintiffs in this motion were raised during the proceedings on the intervenors' motion to intervene. Judge O'Hara considered them and rejected them.  Plaintiffs, however, failed to seek review of the magistrate's decision. This failure to seek review generally waives any further consideration of these issues by this court or on appeal.  <u>See</u> Fed.R.Civ.P. 72(a).  Nevertheless, the court shall review the matters.

They have recently provided that information to the court.

In response to the information provided to the court, plaintiffs argue that KLULAC and HALO have failed to demonstrate they have standing in this case. They assert that (1) the organizations need to show that they have at least two members who have standing to intervene in this case; (2) these members cannot be one of the individual intervenors who failed to comply with Judge O'Hara's order; (3) the members must have been members of the organizations on October 20, 2004, the date the associations sought to intervene; (4) the members must be individuals as defined by K.S.A. 76-731a(b)(2); and (5) the members must be illegal aliens who have filed or will file the affidavits described in K.S.A. 86-731a(b)(2)(C).

The question initially presented by plaintiffs' motion is whether a party seeking to intervene must satisfy not only the requirements of Rule 24, but also the standing requirements of Article III. The Supreme Court has declined to determine this issue. See Diamond v. Charles, 476 U.S. 54, 68-9 (1986). The circuits have reached differing conclusions with some requiring that intervenors must independently meet Article III standing requirements, EEOC v. National Children's Center, Inc., 146 F.3d 1042, 1046 (D.C.Cir. 1998); Mausolf v. Babbitt, 85 F.3d 1295, 1300 (8th Cir. 1996); while others have held that intervenors

12

need not show standing, <u>Ruiz v. Estelle</u>, 161 F.3d 814, 830 (5th

Cir. 1998); <u>Chiles v. Thornburgh</u>, 865 F.2d 1197, 1213 (11th Cir.

1989).  The Tenth Circuit has not considered the issue.  This

court finds itself in agreement with those courts that have

determined that intervenors need not make a showing of standing.

Rule 24 does not require a proposed intervenor to prove

standing, but only that, as a practical matter, its interest

could be impaired.  In addition,

> Article III represents a limitation on the power of
> the federal courts--not a requirement of all who seek
> to come before them. If, at the outset, a federal
> court has correctly determined that it has an actual
> "case" or "controversy" before it, the purpose of
> Article III is not frustrated by allowing intervenors
> to subsequently participate in the proceedings.

<u>Habitat Educational Center, Inc. v. Bosworth</u>, 221 F.R.D. 488,

493 (E.D.Wis. 2004) (citation omitted).

Even if the court were to find that a showing of standing

was necessary, we would conclude that the intervenors have

demonstrated standing.  An organization must satisfy three

requirements to have associational standing:  (1) its members

must otherwise have standing to sue in their own right; (2) the

interests it seeks to protect must be germane to the

organization's purpose; and (3) neither the claim asserted nor

the relief requested requires the participation of individual

members in the lawsuit.  <u>Roe No. 2 v. Ogden</u>, 253 F.3d 1225, 1230

(10th Cir. 2001).  The court has reviewed the information filed by the intervenors.  The court is confident that the in camera information, as well as the other information submitted by the intervenors, demonstrates that the organizations have associational standing.  Contrary to the argument of the plaintiffs, there is no requirement of multiple members, one member of each organization is sufficient to confer standing. Warth v. Seldin, 422 U.S. 490, 511 (1975); American Library Ass'n v. FCC, 401 F.3d 489, 492 (D.C.Cir. 2005); Doe v. Porter, 370 F.3d 558, 561 (6th Cir. 2004).  Moreover, the court fails to find any support for plaintiffs' position that the members of the associations cannot be one of the individual intervenors who failed to comply with Judge O'Hara's order.  Accordingly, this motion shall be denied.

**DEFENDANTS'/INTERVENORS' MOTIONS TO DISMISS**

The defendants make the following arguments in their motion to dismiss.  First, they contend the plaintiffs lack standing to assert Counts 1, 3, 4, 5 and 6 because they have failed to establish the three necessary elements of Article III standing. Second, they further assert that Counts 1 through 6 should be dismissed because the statutes and regulations relied upon by the plaintiffs do not create private causes of action.  Third, they argue that K.S.A. 76-731a is not preempted by any federal

14

statutes or regulations.  Finally, they contend that Count 7 should be dismissed because plaintiffs have not pled an equal protection violation.  The defendants have also suggested that Governor Sebelius should be dismissed because she is not a proper party.  They assert she has no responsibility in enforcing K.S.A. 76-731a.

The intervenors make the following arguments in their motion to dismiss.  First, they contend that the court lacks standing to assert Counts 1, 3, 4, 5 and 6.  Second, they contend that Count 1 through 6 should be dismissed because the statutes and regulations relied upon by the plaintiffs do not create private causes of action.  Finally, they contend that all claims asserted by the plaintiffs either fail to state a claim upon which relief can be granted or simply legally lack merit.

*Governor Kathleen Sebelius*

The defendants contend that Governor Sebelius is not a proper party to this lawsuit.  They contend she should be dismissed because she has no role in enforcing K.S.A. 75-731a. "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby

attempting to make the state a party." <u>Ex Parte Young</u>, 209 U.S. 123, 157 (1908). "Under United States Supreme Court precedent, when a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant, even when that party has made no attempt to enforce the rule." <u>American Civil Liberties Union v. Florida Bar</u>, 999 F.2d 1486, 1490 (10th Cir. 1993).

Under Kansas law, the Governor has no involvement with the enforcement of K.S.A. 76-731a. The Kansas Constitution merely gives the Governor generalized responsibility for "enforcement of the laws of this state." Kansas Const. Art. 1, § 3. This general enforcement power, however, is not sufficient to establish the connection to the statute required to meet the <u>Ex parte Young</u> exception to Eleventh Amendment immunity. <u>See Women's Emergency Network v. Bush</u>, 323 F.3d 937, 949-50 (11th Cir. 2003)(where enforcement of state statute is the responsibility of parties other than governor, the governor's general executive power to enforce the statute is insufficient to confer jurisdiction over him in an action challenging statute as unconstitutional); <u>Waste Management Holdings, Inc. v. Gilmore</u>, 252 F.3d 316, 331 (4th Cir. 2001)(mere fact governor is under general duty to enforce laws does not make him a proper defendant in every action attacking constitutionality of a state

16

statute), <u>cert. denied</u>, 535 U.S. 904 (2002).  Accordingly, the court shall dismiss Governor Sebelius as a defendant in this action.

*Standing*--Counts 1, 3, 4, 5 and 6

The defendants and intervenors contend that plaintiffs lack standing to assert claims in Count 1 and Counts 3 through 6. Both parties initially agreed that plaintiffs do have standing to assert the claim under § 1623 in Count 2 and the claim under equal protection in Count 7.[6]

It is well established that to litigate a justiciable controversy under Article III, a plaintiff must have standing to maintain suit.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992); <u>Morgan v. McCotter</u>, 365 F.3d 882, 887 (10th Cir. 2004).  A party "raising only a generally available grievance about government--claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large--does not state an Article III case or controversy." <u>Lujan</u>, 504 U.S. at 573-74.  As explained

---

[6]Following oral argument, the court directed the parties to provide supplemental briefs on the issue of plaintiffs' standing to assert their equal protection claim.  In light of the court's request, the defendants and intervenors have taken different positions on this issue.  The court shall consider this issue in our discussion of the equal protection claim.

recently by the Tenth Circuit:

> Although the standing question is often dressed in the
> dazzling robe of legal jargon, its essence is simple--
> what kind of injuries are courts empowered to remedy
> and what kind are they powerless to address.  Standing
> is not measured by the intensity of the litigant's
> interest or the fervor of his advocacy.

Heath v. Board of County Commissioners of Boulder County, 92
Fed.Appx. 667, 671-72 (10th Cir. 2004) (quotations and citations
omitted).

There are three requirements to Article III standing:  (1)
injury-in-fact, (2) causation, and (3) redressability.  Essence,
Inc. v. City of Fed. Heights, 285 F.3d 1272, 1280 (10th Cir.),
cert. denied, 537 U.S. 947 (2002).   An injury-in-fact is an
"'invasion of a legally protected interest' that is (a) concrete
and particularized and (b) actual or imminent, i.e., not
conjectural or hypothetical."  Id. (quoting Lujan, 504 U.S. at
560).  Causation requires that the injury is fairly traceable to
the defendant's conduct, rather than some third party not before
the court.  Id.  Redressability means that it is likely that a
favorable court decision will redress the injury of the
plaintiff.  Id.  If a party satisfies the minimal constitutional
requirements, then a court may still deny standing for
prudential reasons, "a judicially created set of principles
that, like constitutional standing, places 'limits on the class
of persons who may invoke the courts' decisional and remedial

18

powers.'" <u>Board of County Commissioners of Sweetwater County v. Geringer</u>, 297 F.3d 1108, 1112 (10th Cir. 2002) (quoting <u>Warth</u>, 422 U.S. at 499). The burden of establishing standing rests on the party invoking federal jurisdiction, and the evidence needed to carry that burden depends on the stage of the litigation. <u>Id</u>. At the summary judgment stage when standing is at issue, a plaintiff must demonstrate that there exists no genuine issue of material fact as to justiciability, and "mere allegations" of injury, causation, and redressability are not sufficient. <u>Id</u>.

The defendants and the intervenors argue initially that plaintiffs have no injury in fact. They point out that plaintiffs are not affected in any way by K.S.A. 76-731a. They assert:

> [K.S.A. 76-731a] only affects the price certain students pay to attend a regents school. Thus, the *only* people affected by the amount of Tuition charged to certain students under [K.S.A. 76-731a] are the students who satisfy each of its requirements--and plaintiffs are not among them. Plaintiffs do not have personal rights which are affected.

The defendants and intervenors further argue that a favorable decision will not benefit plaintiffs. Defendants and intervenors argue that striking down K.S.A. 76-731a as preempted by federal law will not benefit plaintiffs. They state: "Instead, Plaintiffs would simply deny certain Kansas high school graduates the right to pay in-state tuition."

Plaintiffs respond that they "possess a property right to the tuition premiums charged to them by Defendants under color of state law [K.S.A. 76-731a], a right arising under 8 U.S.C. § 1621." The position of plaintiffs is that they have suffered an injury by being forced to pay out-of-state tuition while illegal aliens under K.S.A. 76-731a have been allowed to pay in-state tuition. They further contend that college education is a scarce resource and that competition for that resource gives them standing. Finally, they assert that, beyond their specific injury of having to pay more tuition, they are part of a larger group of individuals who possess standing to challenge K.S.A. 76-731a, "namely all citizens and lawfully-admitted aliens paying tuition at Kansas postsecondary educational institutions." In support of this argument, they make the following claim: "The more illegal aliens take advantage of the state subsidy under [K.S.A. 76-731a], the more likely it is that such subsidies will increase the financial burdens on Kansas universities and necessitate greater tuition hikes than would have otherwise occurred."

After a careful review of the evidence and the arguments, the court finds that plaintiffs have failed to demonstrate that they are injured in fact by K.S.A. 76-731a. Injury-in-fact must be concrete and imminent. <u>Essence, Inc.</u>, 285 F.3d at 1281.

20

Hypothetical or conjectural harm is not sufficient.  Id.  When a law does not apply to a party, that party has no invasion of a legally protected interest.  Id.  Here, none of the plaintiffs are subject to the provisions of K.S.A. 76-731a.  Prior to the passage of the law, plaintiffs paid out-of-state tuition.  With the passage of K.S.A. 76-731a, plaintiffs continued to pay out-of-state tuition.  The law passed by the Kansas legislature does not apply to plaintiffs, and plaintiffs have made no argument that it does.

Plaintiffs' suggestion that they somehow have standing based on some property right in their tuition or based upon increased tuition rates is completely unfounded.  They have provided no support for the contention that they, as out-of-state residents, have a "property right" in in-state tuition rates.  In addition, they have failed to provide any evidentiary support for the contention that K.S.A. 76-731a has led to an increase in tuition rates.  Plaintiffs have provided affidavits in which they show that their tuition rates have increased.  They have also cited to newspaper articles that show that tuition rates did rise at Kansas universities in the time period following the passage of K.S.A. 76-731a.  However, the record is barren of any evidence that the resulting tuition increases were the product of K.S.A. 76-731a.  In fact, the anecdotal evidence before the court

21

suggests otherwise.  First, we note that the newspaper articles noted by plaintiffs also indicate that tuition rates at Kansas universities increased in the two years preceding the passage of K.S.A. 76-731a.  Second, the information provided to the court suggests that the impact of K.S.A. 76-731a has been minimal. The parties have only identified a handful of students who have been able to take advantage of K.S.A. 76-731a, and most of those are not illegal aliens.  As a result, we fail to find that plaintiffs have identified any injury-in-fact resulting from the passage of K.S.A. 76-731a.

Moreover, plaintiffs are unable to establish any legally connected interest to 8 U.S.C. § 1621, SEVIS or the general immigration laws.  Plaintiffs are not affected by any of the specifically cited immigration laws or the general immigration laws in any particularized way.  Plaintiffs are unable to assert or demonstrate any personal injury resulting from their violation.  They stand in the same shoes as any citizen.  Such circumstances fail to establish standing.  See Lujan, 504 U.S. at 573-74 (plaintiff "claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large--does not state an Article III case or controversy.").

Finally, plaintiffs have failed to show that a favorable decision on Counts 1, 3, 4, 5 and 6 will redress the injury to them.  If the court were to find K.S.A. 76-731a is preempted by federal law or in violation of federal law as suggested in Counts 1, 3, 4, 5 and 6, plaintiffs will not receive any benefit.  A favorable decision for the plaintiffs would require those who have received the benefit of K.S.A. 76-731a to pay more, but plaintiffs' tuition bills would not change.  Since the relief that could be granted to plaintiffs by the court will provide them with no personal benefit, they lack standing.  See Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 39 (1976) ("The necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement.").

In sum, plaintiffs are in a situation similar to others who have challenged other immigration policies and laws.  See, e.g., Federation for American Immigration Reform, Inc. v. Reno, 93 F.3d 897 (D.C.Cir. 1996) (immigration reform group lacks standing to challenge government's scheme for parole and adjustment of Cuban nationals as violation of federal immigration law), cert. denied, 521 U.S. 1119 (1997); Sadowski v. Bush, 293 F.Supp.2d 15 (D.D.C. 2003) (individual lacks standing to challenge government's failure to fully enforce

immigration laws and to allow illegal immigrants into United States); Ridge v. Verity, 715 F.Supp. 1308 (W.D.Pa. 1989) (members of U.S. House of Representatives, certain states and immigration reform group lack standing to challenge inclusion of illegal aliens in 1990 census for purposes of congressional apportionment). Accordingly, the court finds that plaintiffs lack standing to bring the claims asserted in Counts 1, 3, 4, 5 and 6 of their amended complaint.

*Private Right of Action*--Count 2

With the aforementioned decision, the court turns to consideration of the defendants'/intervenors' argument concerning Count 2. The defendants/intervenors contend that Count 2 should be dismissed because 8 U.S.C. § 1623 does not create a private right of action.

In briefs and arguments made after the defendants/intervenors filed their motions to dismiss, plaintiffs sought to recharacterize their claims. Although only one of the claims in the amended complaint appeared to be a preemption claim, plaintiffs suggested that the first six claims were all preemption claims. The court notes that none of the claims other than Count 4 use the word preemption or preempt in them. Plaintiffs apparently chose to take this approach because they believed they had clear Tenth Circuit authority, Qwest

<u>Corp. v. City of Santa Fe</u>, 380 F.3d 1258 (10th Cir. 2004), that allowed them to proceed on preemption claims without the requirement that the particular statute or series of statutes provided a private cause of action. This plan, however, did not cure the standing problem they faced on their claims. To the extent that the plaintiffs contend that their first six claims are causes of action based upon preemption, the court finds that the plaintiffs lack standing to pursue them for the reasons previously stated. The defendants and intervenors conceded that plaintiffs had standing to pursue a claim based upon a violation of 8 U.S.C. § 1623. They recognized that plaintiffs' cause of action based upon a claim of enforcing § 1623, if meritorious, would meet the Article III standing requirements. The court agrees that plaintiffs do have standing on this claim. Accordingly, we must consider whether § 1623 creates a private right of action so that plaintiffs can pursue a claim to enforce it.

In <u>Boswell v. Skywest Airlines, Inc</u>, 361 F.3d 1263, 1266 (10th Cir. 2004), the Tenth Circuit summarized the law for determining when a statute creates a private right of action as follows:

> The test for determining whether a statute creates a private right of action has evolved substantially over the last thirty years. Supreme Court cases decided early in this period focused on Congressional

25

purpose. See, e.g., J.I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (stating that "under the circumstances here it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" and concluding that sections 14(a) and 27 of the Securities Exchange Act, 15 U.S.C. §§ 77n(a), 77aa, authorized a federal cause for rescission or damages to a stockholder). Subsequently, the Court formulated a four-part inquiry, asking whether: (1) the plaintiff is part of the class for whose benefit the statute was enacted; (2) there is any indication of legislative intent, explicit or implicit, either to create or to deny a private right of action; (3) it would be consistent with the underlying purpose of the legislative scheme to imply a private right of action for the plaintiff; and (4) the cause of action is one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law. See Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); see also Southwest Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1169 (10th Cir.2001) (discussing Cort).

Later Supreme Court decisions have shifted the inquiry again. Now, "Cort's four factors have been effectively condensed into one--whether Congress expressly or by implication, intended to create a private cause of action." Sonnenfeld v. City & County of Denver, 100 F.3d 744, 747 (10th Cir.1996) (citing Transamerica Mortgage Advisors v. Lewis, 444 U.S. 11, 15-16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) and Touche Ross & Co. v. Redington, 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)). Thus, in its recent decisions, the Supreme Court has emphasized that the private right of action inquiry focuses on the Congressional intent underlying the particular statute at issue:

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a

> cause of action does not exist and courts
> may not create one, no matter how desirable
> that might be as a policy matter, or how
> compatible with the statute.    Raising up
> causes of action where a statute has not
> created them may be a proper function for
> common-law courts, but not for federal
> tribunals.

Alexander v. Sandoval, 532 U.S. 275, 286-87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (internal quotation marks and citations omitted). This circuit's decisions have emphasized that Congressional intent is determinative. See, e.g, Davis-Warren Auctioneers, J.V. v. FDIC, 215 F.3d 1159, 1162 (10th Cir. 2000) ("To decide whether a private right of action is implicit in a statute, we must determine 'whether Congress', expressly or by implication, intended to create a private cause of action.") (internal quotation marks omitted); Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army, 111 F.3d 1485, 1493 (10th Cir. 1997) ("In determining whether an implied private right of action exists under a particular statute, the focus is solely on congressional intent.").

In determining Congressional intent under this newer standard, we examine the statute for "rights-creating language," Sandoval, 532 U.S. at 288, 121 S.Ct. 1511,--that which "explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff." Cannon v. Univ. of Chicago, 441 U.S. 677, 690 n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 1560 (1979), and language identifying "the class for whose especial benefit the statute was enacted," id. at 688 n. 9, 99 S.Ct. 1946 (internal quotation marks omitted).    We also consider the relation between the specific provision at issue and the related statutory scheme. Love, 310 F.3d at 1353; see, e.g., Southwest Air, 268 F.3d at 1170 (examining the general regulatory structure of the Federal Aviation Act, 1958, 49 U.S.C. § 40101 et seq, in determining that the Anti-Head Tax Act, 49 U.S.C. § 40116, does not create a private cause of action); Chemical Weapons, 111 F.3d at 1494 (examining the "general regulatory scheme, comprised in this instance by the myriad of environmental statutes that regulate the Army's operations [at the facility at issue]" in concluding that the 1986 Defense Authorization Act did not establish a private

cause of action).

The defendants begin by arguing that IIRIRA, of which 8 U.S.C. § 1623 is part, does not explicitly give individuals a remedy to enforce immigration laws.  In fact, it specifically provides that the Secretary of Homeland Security has the responsibility to enforce it.  See 8 U.S.C. § 1103(a)(1).[7]  The intervenors concur in these arguments and assert that no support can be found for the idea that Congress intended to grant enforcement rights to any private citizens for the alleged violation asserted in Count 2.

Plaintiffs initially suggest that they have a private cause of action under § 1623 because "[n]o federal statute or regulation forecloses a right of action by U.S. citizens who are injured by a State violation of the requirements of [the statute]."  They further argue that the language of the statute grants them express rights.  They assert "[t]he language of the statute makes the U.S. citizen or national who is granted eligibility for a state postsecondary education benefit the

_____

[7] This statute reads as follows:
The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers. . . ."

beneficiary of the provision, even if he or she is not a resident of the state."

Plaintiffs have further suggested that they have a private cause of action under § 1623 because a private right of action is implied where a "compelling federal interest" dictates a reason for implementing civil remedies.  They rely upon two Tenth Circuit cases from 1972 and 1973 for support of the "compelling federal interest" test.  However, as pointed out by the defendants, the "compelling government interest" test is no longer used.  As pointed out previously, the test has evolved from the four-factor <u>Cort</u> test to one factor:  whether Congress, expressly or by implication, intended to create a private right of action.

With the application of that test, the court fails to find any support that Congress intended to create a private right of action through the passage of 8 U.S.C. § 1623.  Congress specifically designated the Secretary of Homeland Security as the individual in charge of enforcing immigration laws.  There is nothing in § 1623 or the other immigration statutes that demonstrates an intent by Congress to create a private right of action.  As pointed out by the defendants, the focus of § 1623 is illegal aliens, not citizens.  This focus on aliens, rather than plaintiffs or citizens in general, "creates no implication

of an intent to confer rights on [the plaintiffs]." <u>Alexander v. Sandoval</u>, 532 U.S. 275, 290 (2001). Accordingly, the court finds that Count 2 must be dismissed because 8 U.S.C. § 1623 does not create a private right of action.

*Equal Protection*--Count 7

Finally, the court shall turn to the equal protection claim asserted by plaintiffs in Count 7. The Fourteenth Amendment to the United States Constitution guarantees that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." This means the state must treat similarly situated individuals similarly, in the absence of an adequate reason to distinguish between them. As a general rule, however, "'legislatures are presumed to have acted within their constitutional power despite the fact, in practice, their laws result in some inequality.'" <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992) (quoting <u>McGowan v. Maryland</u>, 366 U.S. 420, 425-26 (1961)).

The court must consider the type of equal protection challenge asserted by plaintiffs. In Count 7 of their amended complaint, plaintiffs appear to allege only a facial equal protection challenge. However, in their briefs and during argument before the court, plaintiffs have suggested that they are also asserting an as-applied equal protection claim. The

30

court would ordinarily be reluctant to consider the as-applied claim given its absence in the amended complaint. However, the court believes that the as-applied claim should be considered here for two reasons. First, the defendants/intervenors, although complaining about the lack of an as-applied claim in the amended complaint, have thoroughly responded to the claim. The court sees no prejudice to the defendants/intervenors in addressing this claim. Second, in the context of the present equal protection claim, a facial challenge would logically include within it an as-applied challenge. See City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 478 (1985) (Marshall, J., concurring in part and dissenting in part) ("The formal label under which an equal protection claim is reviewed is less important than careful identification of the interest at stake and the extent to which society recognizes the classification as an invidious one."); Ramos v. Town of Vernon, 353 F.3d 171, 174 n. 1 (2nd Cir. 2003).

Although the defendants/intervenors initially conceded standing on the plaintiffs' equal protection claim, the court directed the parties to submit briefs on that issue. The parties have since provided the court with new arguments on this issue. The court has previously discussed standing in some detail, but we shall further discuss the law as it relates to

standing where equal protection claims are asserted.

In their equal protection claim, plaintiffs assert that K.S.A. 76-731a creates two classes of non-Kansas residents: illegal or undocumented aliens and United States citizens.[8] According to plaintiffs' allegations, although these two classes are equally situated, the illegal aliens can receive in-state tuition rates under K.S.A. 76-731a while the United States citizens cannot.  Plaintiffs suggest that the unavailability of in-state tuition to United States citizens from other states is the statute's discriminatory feature.

In addressing the issue of standing, plaintiffs point to several arguments.  First, they rely upon affirmative action cases in support of their position that they have standing to assert their equal protection claim.  Specifically, they point to <u>Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville</u>, 508 U.S. 656, 663-64 (1993) for

---

[8] The defendants and intervenors argue strenuously that plaintiffs' primary flaw in its equal protection argument is that there is no classification based on alienage.  They point out that K.S.A. 76-731a applies equally to all individuals, aliens or U.S. citizens. They contend: "There is no unequal or disparate treatment based on alienage and both groups or classes are treated equally.  Since both undocumented aliens and non-resident U.S. citizens can obtain tuition rates equivalent to resident rates through [K.S.A. 76-731a] on the identical basis, Count VII should be dismissed."  The court leaves this issue for another day, because we do not find that plaintiffs have standing to assert their equal protection claim even under the manner in which they contend K.S.A. 76-731a must be interpreted.

support.  Second, they assert they are injured by K.S.A. 76-731a because they are forced to pay the higher out-of-state tuition rates.  This argument is two-fold.  They initially point out that they are required to pay higher rates simply by their status as out-of-state residents, but they also contend that the passage of K.S.A. 76-731a "places upward cost pressure on the tuition rates paid by all students, driving nonresident tuition rates higher."

In City of Jacksonville, an association of contractors challenged an ordinance that gave preferential treatment to certain minority-owned businesses in the award of city contracts.  The Supreme Court held that the injury in fact constitutionally required for standing to challenge on equal protection ground a racially discriminatory procedure for distributing a scarce governmental benefit, such as public works contracts, is the "inability to compete on an equal footing" for the rationed benefit, not the deprivation of the benefit itself. City of Jacksonville, 508 U.S. at 666.

Plaintiffs seem to believe that City of Jacksonville applies to every case where an equal protection claim is asserted.  We must disagree.  The Court in City of Jacksonville was concerned with standing in the context of an equal protection claim where plaintiffs claimed they had been disadvantaged by a governmental

33

program that limited opportunities.  The Court made clear that
its decision was limited to these circumstances:  "The 'injury
in fact' in *an equal protection case of this variety* is the
denial of equal treatment resulting from the imposition of the
barrier, not the ultimate inability to obtain the benefit."  Id.
(emphasis added).

The nature of the equal protection claim here differs from
that asserted in <u>City of Jacksonville</u>.  K.S.A. 76-731a
establishes no barriers precluding plaintiffs from admission to
Kansas universities.  The fact that K.S.A. 76-731a allowed
undocumented aliens to pay in-state tuition rates did nothing to
change the situation of plaintiffs.  From this standpoint, the
exception created by K.S.A. 76-731a does not differ from the
myriad of other exceptions created by Kansas law to allow some
individuals to pay in-state tuition.  <u>See</u>, <u>e.g.</u>, K.S.A. 76-
729(b)(1) (persons which includes spouses and dependents who are
employees of a state educational institution); K.S.A. 76-
729(b)(2) (persons which include spouses and dependents who are
in military service); K.S.A. 76-729(b)(4) (persons which
includes spouses and dependents having special domestic
relations circumstances).

Plaintiffs have not been denied any benefit by K.S.A. 76-
731a because they cannot fulfill the lawful, non-discriminatory

34

requirements or qualifications for the benefit.  As explained by
the defendants and the intervenors, the reason that plaintiffs
must pay out-of-state tuition is K.S.A. 76-729, not K.S.A. 76-
731a.  There is no dispute that states can force out-of-state
residents to pay more in tuition.  <u>Vlandis v. Kline</u>, 412 U.S.
441, 452-53 (1973) ("We fully recognize that a State has a
legitimate interest in protecting and preserving the quality of
its colleges and universities and the right of its own bona fide
residents to attend such institutions on a preferential tuition
basis.").  None of the plaintiffs meet the first two
requirements for the application of K.S.A. 76-731a.  Plaintiffs
have made no suggestions that these requirements are unlawful or
discriminatory.  As noted by the Tenth Circuit:

> [A] person who fails to satisfy lawful,
> nondiscriminatory requirements or qualifications for
> the benefit lacks standing to raise claims of
> discrimination in the denial of the benefit. . . ."[A]
> mere abstract denial of equal opportunity does not
> constitute injury in fact.  A general denial of equal
> opportunity does not confer standing on a particular
> individual unless that individual would have had
> access to the benefit at stake in the absence of
> discrimination."  <u>N.A.A.C.P., Boston Chapter v.</u>
> <u>Harris</u>, 607 F.2d 514, 520 (1st Cir. 1979).
> Discrimination cannot be the cause of injury to an
> applicant who could not have obtained the benefit even
> in the absence of the discrimination.

<u>Wilson v. Glenwood Intermountain Properties, Inc.</u>, 98 F.3d 590,
593-94 (10th Cir. 1996).

Under these circumstances, the court finds that plaintiffs

35

cannot demonstrate that K.S.A. 76-731a has any application to them.  Accordingly, they are unable to demonstrate sufficient injury to establish standing.  See Petit v. City of Chicago, 352 F.3d 1111, 1113 (7th Cir. 2003) (officers who would have been rejected for promotion even without allegedly discriminatory process lacked standing to bring equal protection claim against that process because they failed to suffer cognizable injury), cert. denied, 541 U.S. 1074 (2004); see also Rector v. City and County of Denver, 348 F.3d 935, 945 (10th Cir. 2003) (named representatives of class of parking ticket recipients lacked standing to pursue claim that tickets deprived class of due process by giving erroneous impression the recipients would necessarily incur late fee if they tried to contest ticket; neither representative claimed to have legal basis for contesting ticket, and so could claim no injury in fact).

The court's earlier comments on the injury suffered by the plaintiffs concerning increased tuition rates are applicable here.  Plaintiffs have made no showing that K.S.A. 76-731a has or will increase tuition rates in Kansas.  Thus, the court fails to find that plaintiffs have established any injury in fact on their equal protection claim.

In addition, the court's prior discussion on redressability for the purposes of standing on Counts 1, 3, 4, 5 and 6 is

equally applicable to plaintiffs' equal protection claim.   The court cannot provide any relief that would be beneficial to the plaintiffs.   <u>See</u>, <u>e.g.</u>, <u>Doe v. Pryor</u>, 344 F.3d 1282, 1285-87 (11th Cir. 2003) (lesbian mother, who lost child custody suit in state court based in part on the use of Alabama statute criminalizing "deviate sexual intercourse," lacked standing to challenge the statute on equal protection grounds because injury could not be redressed).   Plaintiffs will still pay out-of-state tuition rates even if the court found that K.S.A. 76-731a violated the Equal Protection Clause.   Accordingly, for all of the aforementioned reasons, the court finds that plaintiffs lack standing to assert their equal protection claim.

In reaching the decisions in this case, the court did not reach the issues of most of the claims asserted by the plaintiffs.  This is both regrettable and fortunate.  The issues raised by this litigation are important ones.  The decision on what to do concerning the education of illegal aliens at the postsecondary level in our country is indeed significant.  That decision, however, is probably best left to the United States Congress and the Kansas legislature.

**IT IS THEREFORE ORDERED** that defendants' and intervenors' motions to dismiss (Doc. ## 41 and 43), which the court has converted to motions for summary judgment, be hereby granted.

37

The court hereby dismisses Counts 1 and 3 through 7 due to plaintiffs' lack of standing.  The court further dismisses Count 2 because plaintiffs have no private right of action under 8 U.S.C. § 1623.  Finally, the court also dismisses Governor Kathleen Sebelius as a party to this action.

IT IS **FURTHER ORDERED** that plaintiffs' motion to dismiss intervenor-defendants (Doc. # 81) be hereby denied.

**IT IS SO ORDERED.**

Dated this 5th day of July, 2005 at Topeka, Kansas.


s/Richard D. Rogers
United States District Judge

38